IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 4:10CR3100 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | FINDINGS, RECOMMENDATION, |
| | ) | AND ORDER |
| HELIODORO GOMEZ VALDEZ, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

The defendant has moved to suppress all evidence and statements obtained as a result of his alleged illegal detention and subsequent search of the vehicle he was operating on July 14, 2010. (Filing No. 23). The defendant claims there was no probable cause to initiate a traffic stop, the defendant was unreasonably detained in violation of his Fourth Amendment rights, the warrantless search of his vehicle was illegal, and his Fifth Amendment rights were violated by the officers' post-arrest questioning.

For the reasons discussed below, defendant's motion to suppress should be denied. Specifically, the defendant was lawfully stopped for speeding; facts developed during the course of the stop indicated possible criminal activity and justified detaining the defendant to further investigate; and the defendant knowingly and voluntarily consented to the vehicle search and waived his Miranda rights prior to any interrogation.

## FINDINGS OF FACT

On the morning of July 14, 2010, Trooper Bigsby of the Nebraska State Patrol saw a 2007 Ford Edge with California plates traveling east on Interstate 80 on the west edge of Lincoln. Based on his visual estimate, Trooper Bigsby believed the vehicle was traveling in excess of the posted speed limit. He then used a calibrated radar device and confirmed the

vehicle was traveling 70 miles per hour. The posted speed limit was 65 miles per hour. Trooper Bigsby also noticed a large handicapped "hang tag" hanging from the rearview mirror. He pulled in behind the defendant's vehicle and activated his overhead lights to initiate a traffic stop.

The defendant pulled over and stopped. Trooper Bigsby parked behind the stopped vehicle, exited his patrol car, and approached the driver. The trooper noticed an air freshener hanging from one of the air vents on the front of the car. He asked the driver to produce his driver's license and vehicle registration information. The trooper also asked for identification from the passenger. Trooper Bigsby then asked the driver, identified as defendant Gomez-Valdez, to be seated in the patrol car.

When Trooper Bigsby began asking the defendant questions about his trip, it became apparent that the defendant's ability to understand and speak English was limited. Despite these language difficulties, the officer eventually understood the defendant to say that defendant's license was expired, he was coming from California, he was traveling to San Pedro, Iowa to see a sick brother, and he and the passenger intended to stay in Iowa for a few weeks. When asked about the passenger, the defendant identified her as "Erica," and initially stated he did not know Erica's last name. The defendant later stated Erica was a family member and her last name was Garcia. In response to the officer's questioning, the defendant denied having any criminal history.

Trooper Bigsby exited the patrol car to speak with Erica Garcia, the passenger. In response to the officer's questioning, Garcia stated she did not know the driver's last name or the state to which they were going. She stated the driver was her uncle and they were traveling to visit a sick relative for a day or two. She denied having any criminal history. Garcia appeared very nervous.

Approximately 11 minutes after the traffic stop was initiated, Trooper Bigsby returned to his patrol vehicle and called dispatch to obtain license information for the defendant and criminal history information for both the defendant and Garcia about 15 minutes in to the traffic stop.

While waiting for information from dispatch, Bigsby used his cell phone to contact Trooper Hernandez, who is fluent in Spanish, to help translate further questioning by Trooper Bigsby. Through Trooper Hernandez, Trooper Bigsby repeated his questioning about the origin, destination, and purpose of the defendant's trip. The defendant's answers were consistent with his prior answers, except that he now stated he could not remember Erica's last name, that she was along for the ride because his wife was working, and they were traveling to San Pablo, Iowa. Due in part to a bad cell phone connection, the process of contacting Trooper Hernandez and conducting questioning with his assistance took approximately 20 minutes.

About 30 to 40 minutes after the defendant's vehicle was stopped, Trooper Pelster arrived at Trooper Bigsby's request. Bigsby called dispatch and requested vehicle ownership information and a "pipeline check." A "pipeline check" is performed by contacting the El Paso Intelligence Center, (EPIC), to obtain information collected by the DEA from its contacts, and contacts made by ICE, the Border Patrol, and the FBI regarding persons or vehicles. In response to the trooper's requests, dispatch reported the vehicle the defendant was driving was not owned by either the defendant or Garcia, and after-factory compartments had previously been found in the vehicle during a U.S./Mexico border crossing. The defendant explained he had known the third-party vehicle owner, Jose Gomez, for about a year and Gomez let him use the vehicle.

About 50 minutes into the stop, Bigsby asked Garcia to come back to the patrol vehicle and interpret for the trooper while he explained the warning ticket to the defendant. Trooper

Bigsby handed the warning ticket, and the defendant's identification card and vehicle information, to the defendant. Trooper Bigsby then asked Garcia and the defendant for consent to search the vehicle. Trooper Bigsby specifically advised them that they did not have to agree to the search. Garcia consented to the search, both verbally and in writing. She also translated the officer's request to the defendant, and the defendant provided oral consent to search. Trooper Bigsby then asked Garcia to interpret a Spanish consent-to-search form, and although Garcia initially stated that she was unable to read Spanish, she eventually read the form to the defendant aloud. The defendant signed the written consent form.

Trooper Bigsby and another trooper searched the vehicle. The defendant stood nearby, but never stated or indicated that the search should be stopped. The defendant did not appear to be under the influence of drugs or alcohol. While at the scene of the stop, the troopers never drew their weapons, threatened the defendant, or promised the defendant anything in exchange for his cooperation. Their attitude and tone was professional throughout.

During the vehicle search, the officers found a plastic-wrapped package believed to contain a controlled substance. The defendant and Garcia were handcuffed and taken to the Nebraska State Patrol's headquarters in Lincoln.

At the NSP office, Investigator Gregory Kallhoff spoke to the defendant with the assistance of a proficient English-Spanish interpreter. The defendant was read his Miranda rights, indicated he was willing to waive his rights, and signed a Miranda form written in Spanish. The defendant was not interrogated before he signed the Miranda waiver. During the interview, the defendant made incriminating statements. He appeared to understand the questioning, and his answers were responsive to the questions asked. The defendant is an adult

and has past experience in the criminal justice system.[1] Investigator Kallhoff was unarmed, did not badger the defendant during questioning, and did not threaten or promise anything to obtain defendant's responses. The defendant never requested an attorney or refused to answer any question.

The defendant and Garcia agreed to cooperate with law enforcement officials and deliver the controlled substance to Minnesota. The defendant and Garcia were transported to Omaha by Nebraska State Troopers and their custody was relinquished to Investigator Kallhoff and an agent from the DEA. They were transported to the Iowa/Minnesota border where the defendant and Garcia were placed into custody with different law enforcement officials. At some point during July 15, 2011 the defendant experienced health related problems and was unable to complete the delivery of the controlled substance. He was taken to the hospital, where he was examined and released to law enforcement officers. He was then taken to the Dakota County jail temporarily until his initial appearance.

On July 16, 2011 Department of Homeland Security Special Agent Trevor Hamblen and Officer Bob Buth transported the defendant to St. Paul, Minnesota for his initial appearance. Agent Hamblen, who is fluent in Spanish, advised the defendant of his Miranda rights and questioned him while they were in route to St. Paul. Agent Hamblen testified that the defendant understood the Miranda warnings but waived those rights in order to speak with Agent Hamblen. Agent Hamblen further testified that the defendant was following the conversation well and showed no indication his health problems from the previous night impacted his answers to Agent Hamblen's questions.[2]

---

[1] At the government's unopposed request, the court took judicial notice of the defendant's criminal history as set forth in the Pretrial Services Report, (filing no. 7).

[2] Agent Hamblen testified that he spoke with the defendant in the morning of July 15, 2011 before his health related problems. The defendant was in custody, but at a hotel in anticipation he

## LEGAL ANALYSIS

The defendant claims the evidence found during the search of the vehicle must be suppressed under the Fourth Amendment because Trooper Bigsby lacked probable cause to stop his vehicle, unreasonably detained the defendant during the stop, and conducted a warrantless vehicle search without probable cause or the defendant's consent. The defendant claims his statements must be suppressed because they were coerced and obtained in violation of defendant's Miranda rights.

### A. Fourth Amendment claims.

A traffic stop is a seizure for Fourth Amendment purposes and must be supported by a reasonable, articulable suspicion that criminal activity is occurring. "A traffic violation, however minor, provides probable cause sufficient to satisfy the constitutional reasonableness requirement." U.S. v. Frasher, 632 F.3d 450, 453 (8th Cir. 2011).

Based on not only his visual estimate of defendant's speed, but also the reading of fully calibrated radar detection equipment, Trooper Bigsby determined the defendant's vehicle was traveling 70 miles per hour in a 65 mile per hour speed zone. The trooper reasonably concluded the defendant's vehicle was traveling at an excessive speed. There was probable cause to initiate a traffic stop. U.S. v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007)(citing Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

---

would complete the delivery of the narcotics. Agent Hamblen testified his conversation was brief and that he simply asked the defendant if he needed anything. Sometime after Agent Hamblen left on July 15, 2011, the defendant was taken to the hospital and subsequently released. Agent Hamblen did not speak with the defendant again until he transported the defendant on the 16th of July.

After making a routine traffic stop, an officer may "conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop," (Lyons, 486 F.3d at 371), and may detain the vehicle occupants while he or she completes the "routine tasks related to the traffic violation, such as writing a citation and completing computerized checks of a driver's license, vehicle registration, and criminal history." Lyons, 486 F.3d at 371 (citing United States v. $404,905.00 in United States Currency, 182 F.3d 643, 647 (8th Cir. 1999)). The officer may also question a vehicle's passengers to verify information provided by the driver. U.S. v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005). An officer cannot detain a motorist for reasons beyond the purpose of the stop unless the officer has "a reasonably articulable suspicion for believing that criminal activity is afoot." Lyons, 486 F.3d at 371. If the officer develops a reasonable basis for suspecting a vehicle is being used to transport contraband, the traffic stop may be extended, and the vehicle occupants detained, for further investigation. Lyons, 486 F.3d at 371.

"To delay a vehicle's occupants after an initial traffic stop has been completed, there must be particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." U.S. v. Briasco, 640 F.3d 857, 859 (8th Cir. 2011)(internal citations and quotation marks omitted). "Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at the totality of the circumstances, in light of the officer's experience." U.S. v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005).

When Officer Bigsby approached the stopped vehicle, he noticed the air freshener over the vent. The defendant was seated in the officer's vehicle, and in response to the officer' questioning, provided the implausible story that he was traveling to San Pedro, Iowa, a nonexistent town with the passenger, a relative named Erica, whose last name he initially did

not know. He explained they were planning to visit a sick brother for two weeks. The officer then spoke with the passenger, who appeared very nervous, claimed she did not know the driver's last name or where they were heading, but did claim they intended to visit a relative for only one or two days. The totality of these facts, all of which were accumulated within 11 minutes after initiating the traffic stop, justified further detention of the vehicle to investigate if criminal activity was afoot. Briasco, 640 F.3d 857, 860 (holding reasonable suspicion existed where the officer noticed an air freshener hanging from the front vent, the defendant appeared nervous, and the driver and passenger provided only vague descriptions of their travel plans); U.S. v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004)(holding conflicting stories provided by vehicle occupants may justify expanding a vehicle stop and detaining the occupants to investigate possible criminal activity).

Trooper Bigsby's further investigation included contacting a Spanish-speaking officer to again question the defendant about the origin, destination, and purpose of his trip and confirm his perceived suspicion was not based on a mere misunderstanding. As to the majority of the Spanish-interpreted questions, the defendant repeated his previous answers. But the defendant now claimed he did not know Erica's last name, and she was along for the ride because his wife was working (not to see a sick relative), and that they were traveling to San Pablo, Iowa; statements which contradicted both his own and Garcia's prior statements. Approximately 15 minutes into the stop, the officer also learned from dispatch that contrary to Garcia's statements, Garcia had been arrested for a drug-related crime in 2009 and/or 2010.

The defendant's answers to Spanish-interpreted questioning served to further fuel, rather than squelch, the officer's suspicion. So he further extended the stop to investigate the vehicle itself. He contacted dispatch and requested vehicle registration information and an EPIC check. In response to this request, dispatch reported the vehicle was owned by a third party and during a prior border crossing, hidden compartments were found in the vehicle.

"[A]n investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion to expand his investigation, even if his suspicions are unrelated to the traffic offense that served as the basis for the stop." U.S. v. Long, 320 F.3d 795, 800 (8th Cir. 2003). A traffic stop can last as long as necessary to confirm or dispel an officer's suspicion of criminal activity; the facts define whether the length of a detention was reasonable. U.S. v. Long, 532 F.3d 791, 795 (8th Cir. 2008). Detention at a traffic stop should end once the purpose of the stop is complete and any additional reasonable suspicion that may have arisen has dissipated.

During the 50 minutes that elapsed between stopping the 2007 Ford Edge and requesting defendant's consent to search the vehicle, the facts continuously evolved, and the officers' basis for suspicion grew. The officers diligently and efficiently performed their investigation, and did not unduly prolong the stop. Based on the totality of circumstances, reasonable suspicion existed throughout the traffic stop. The officers did not violate the defendant's Fourth Amendment rights by detaining him while investigating his possible involvement in ongoing criminal activity.

Trooper Bigsby returned defendant's identification and any vehicle information received, and with Garcia's assistance as an interpreter, delivered and explained the warning citation. The traffic stop was over. With Garcia interpreting for him, Trooper Bigsby then asked for both verbal and written consent to search the vehicle. The defendant expressed his consent to the search; both verbally and in writing. The defendant claims his consent was involuntary and the vehicle search was illegal.

A consent to search is voluntary if it is the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied. United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).

> A court determines whether consent is voluntary under the totality of the circumstances. The Government . . . must show that the defendant behaved in such a manner that the officer reasonably believed that the search was consensual. In evaluating the reasonableness of the officer's belief, we consider the characteristics of the person consenting, including the party's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects. We also consider the environment in which the alleged consent took place, specifically (1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether he stood by silently as the search occurred.

U.S. v. Barnum, 564 F.3d 964, 969 (8th Cir. 2009) (quoting United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005).

The traffic stop occurred on a public road in daylight, and the defendant was not alone. The defendant was not under arrest or handcuffed when consent was given. He is an adult, with prior experience as a criminal defendant, and did not appear to be under the influence of drugs or alcohol. The officer's request for consent was presented through Garcia, who appeared to speak with the defendant in a language he could understand. The defendant was advised that he did not have to consent. Weapons were never drawn, and the defendant was not threatened or promised anything to secure his consent. The defendant watched the search occur, but neither spoke nor gestured to stop the search. Under the totality of these facts, a reasonable officer in Trooper Bigsby's position would have believed the defendant voluntarily consented to the vehicle search. See, e.g., U.S. v. Sanchez, 32 F.3d 1330, 1333 (8th Cir. 1994)(holding a defendant's consent was voluntary where the passenger appeared to translate the officer's request for consent, the driver appeared to understand, he signed a written consent

to search form, and he never objected while the officer was searching the vehicle). The search of the stopped vehicle did not violate defendant's Fourth Amendment rights.

There was probable cause to stop the vehicle the defendant was driving. The defendant was not unreasonably detained during the stop, and the defendant voluntarily consented to the search of the vehicle. The defendant's Fourth Amendment rights were not violated.

B. Fifth Amendment Rights.

The defendant claims the statement he provided at NSP headquarters following his arrest must be suppressed under the Fifth Amendment. The defendant was in custody, but not interrogated prior to being advised of his Miranda rights and stated he was willing to waive those rights. The defendant claims he did not knowingly and voluntarily waive his Miranda rights, and his statements were involuntary and coerced.

> There are "two distinct dimensions" to the inquiry whether a suspect's waiver of his Miranda rights was voluntary, knowing, and intelligent. . . . First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." . . . Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." . . . We consider the totality of the circumstances in determining whether a suspect's waiver is valid.

U.S. v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011).

The defendant was advised of his Miranda rights with the assistance of a Spanish interpreter. His rights were read to him from a Spanish advice of rights form. The defendant acknowledged that he understood his rights. He verbally and in writing expressed a willingness to waive those rights and respond to questioning by law enforcement.

The questioning officer was unarmed. The defendant is an adult, and at the time of his questioning, did not appear under the influence of drugs or alcohol, fatigued, or mentally or physically impaired. He acknowledged he understood each of his rights, and expressed his willingness to cooperate with law enforcement. He never withdrew his consent to interrogation, never refused to answer a question, and never requested the assistance of counsel. He volunteered to assist law enforcement in convincing Garcia to cooperate. He was questioned for less than an hour.

Considering the totality of the circumstances, the defendant knew and understood his rights and he knowingly and voluntarily waived those rights. His statements were not the product of intimidation, coercion, or deception.[3] See, e.g., U.S. v. Torres-Lona, 491 F.3d 750 (8th Cir. 2007); U.S. v. Ruiz, 412 F.3d 871 (8th Cir. 2005).

The defendant's Fifth Amendment rights were not violated. His motion to suppress his statements to law enforcement following his arrest should be denied.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motion to suppress filed by Heliodoro Gomez Valdez, (filing no. 23), be denied in all respects.

---

[3] The defendant's brief in support of his motion to suppress also alludes to statements made by the defendant while he was being transported to Minnesota. The evidence reveals the defendant was only questioned about his alleged illegal activity once during the trip from Omaha to Minnesota. Special Agent Hamblen, who is fluent in Spanish, testified that he Mirandized the defendant and that the defendant understood his rights and waived them prior to answering questions from Agent Hamblen. Thus, the defendant's Fifth Amendment rights were not violated by Agent Hamblen.

The parties are notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS FURTHER ORDERED, the trial of this case is set to commence before the Honorable Richard G. Kopf at 9:00 a.m. on November 28, 2011, or as soon thereafter as the case may be called, for a duration of four (4) trial days, in Courtroom 1, United States Courthouse, Lincoln, Nebraska. Jury selection will be held at commencement of trial.

DATED this 12th day of September, 2011.

BY THE COURT:

*S/ Cheryl R. Zwart*

United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.